IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| IN THE MATTERS OF THE SEARCHES OF THE INFORMATION ASSOCIATED WITH FACEBOOK USER IDS:<br><br>demetrius.byrd.92<br><br>AND<br><br>macmike.getnmoney<br><br>THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | Case No. 1:21-mj- 5 8<br><br><br><br>Case No. 1:21-mj- 5 9<br><br>FILED UNDER SEAL |

**AFFIDAVIT IN SUPPORT OF·**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Justin Headden, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of applications for search warrants for information associated with:

   a.    Facebook user ID: http://facebook.com/demetrius.byrd.92 (hereinafter referred to as "Target Account 1"); and

   b.    Facebook user ID: http://facebook.com/macmike.getnmoney (hereinafter referred to as "Target Account 2")

that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A-1and A-2.  This affidavit is made in support of application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government records and

other information in its possession, pertaining to the subscriber or customer associated with the Target Account.

2.      I am an officer with the Chattanooga Police Department assigned to the Drug Enforcement Administration ("DEA"), United States Department of Justice as a Task Force Officer. As such, I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, and Section 2510(7) and empowered by law to conduct investigations of, among other things, offenses enumerated in Title 21, United States Code, and Section 846. I have been employed as a TFO with DEA for approximately 9 months. I have been employed as a narcotics, gang, and firearms investigator for Chattanooga Police Department for the past 9 years. In connection with my official CPD/DEA duties, I investigate criminal violations of the federal narcotics laws, including but not limited to, Title 21, United States Code, Sections 841, 843, 846, and 848. I have also been involved in various types of electronic surveillance, and in the debriefing of defendants, witnesses, informants, and others who have knowledge of narcotics trafficking, and of the laundering and concealing of proceeds of drug trafficking for the past 9 years. I have received specialized training in the enforcement of laws concerning the activities of narcotics traffickers, including numerous specialized narcotics investigation schools.

3.      I have received specialized training in the investigation of criminal activity from the CPD, as well as various other state law enforcement agencies, and have kept abreast of criminal activities, case developments, procedures, investigative techniques, and other standardized methods of investigation involving property crimes during this time period. I have worked with federal, state, and local agencies in investigations in which stolen properties were recovered and have participated in numerous searches of persons and places for the purpose of recovering stolen goods. I have participated in Organized Crime Drug Enforcement Tasks Forces (OCDETF)

investigations in which narcotics were possessed, bought, sold, and traded and have assisted in the application and service of search warrants and arrest warrants in these cases.

4.     Over the course of my career, I have participated in numerous arrests of known drug traffickers and their associates. This experience has afforded me an opportunity to observe and investigate methods, schemes, and operations used by organized groups, including the use of cellular telephones, social media accounts, and digital display paging devices, and the use of numerical codes and code words to conduct the transactions. In addition, I have participated in investigations concerning the concealment of proceeds of controlled substances, including assets, monies, and bank records, and the identification of co-conspirators through the use of drug ledgers, telephone toll records, telephone bills, photographs, social media accounts, and financial records. These investigations have resulted in the arrests of individuals who have smuggled, received, and/or distributed controlled substances, including methamphetamine, cocaine hydrochloride, cocaine base, heroin, and marijuana, as well as the seizure of controlled substances and proceeds of the sale of controlled substances. I know based upon my training and experience that narcotics traffickers and money laundering organizations routinely use several operational techniques. These practices are designed and implemented to achieve two paramount goals: first, the successful facilitation of the organization's illegal activities that consist of the transportation and distribution of controlled substances and subsequent collection of the proceeds of that illegal activity; and second, minimizing the exposure of organization members, particularly those operating in management roles, from investigation and prosecution by law enforcement.

5.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set

forth all of my knowledge about this matter. It does not set forth all facts known to law enforcement at this time.

6. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of various drug-trafficking offenses, including possession with the intent to distribute and distribution of controlled substances, conspiracy to do the same, and the use of communication devices to further and facilitate the commission of the above listed offenses, in violation of Title 21, United States Code, Sections 841(a)(1), 846, and 843(b) have been committed by the users of the Facebook page affiliated with user ID's: http://facebook.com/demetrius.byrd.92 and http://facebook.com/macmike.getnmoney. There is also probable cause to believe that the search of information described in Attachments A-1 and A-2 will yield evidence of these crimes, as described in Attachments B-1 and B-2.

7. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).\

8. Throughout this affidavit, I refer to "counterfeit controlled substance," "counterfeit controlled pills," and "fake oxycodone pills." In each of these references, I mean pills which appear to be commercially manufactured opiates, however are in fact clandestinely manufactured pills which often contain other controlled substances, primarily fentanyl.

## PROBABLE CAUSE

9. Since approximately January 2021, the DEA, ATF, Chattanooga Police Department, Tennessee Bureau of Investigation, and other federal, state, and local law enforcement agencies have been involved in an investigation involving Demetric POINTER, Jasmine POOLE, Demetrius BYRD, Michael JACKSON, and others. Through this investigation

POINTER and POOLE were identified as significant distributors of counterfeit controlled substances—pills containing fentanyl. As detailed below, JACKSON and BYRD were identified as a source of supply for counterfeit controlled substances—pills containing fentanyl

10.     On January 2nd, 2021, Demetric POINTER (Jasmine POOLE's boyfriend) was arrested and was incarcerated at the Hamilton County Jail. Law enforcement was subsequently able to obtain and review calls made by POINTER while he was incarcerated through the Hamilton County Jail Securus Phone System. The Hamilton County Jail Securus Phone System warns the parties to each call that their communications are subject to monitoring and recording. During these recorded conversations, your affiant was able to identify that POINTER was directing POOLE to operate his drug trafficking organization while he was incarcerated. POINTER would give POOLE directives on how to conduct drug transactions and furthermore who to obtain the drugs from.

11.     On January 19, 2021, your affiant listened to a recorded phone call between POINTER and POOLE that occurred on January 4th, 2021 that started at 5:02 PM. POOLE starts the conversation stating she has bad news that "dude" is not answering the phone anymore. POINTER advises not to worry about him and to get on his Facebook and find "Jermaine Ollie Anderson". POINTER states to text him and state "This is Robert girl answer the phone and then call him". (Robert DAVIS is a known alias of POINTER) POINTER tells POOLE to tell him she has 550 for him and that she is not going to talk on the phone like that. POOLE calls "Jermaine Ollie Anderson" while on the phone and cannot connect at first. POOLE then calls again and speaks with a male and states "Hey this is Robert girl, he said to call you and tell you I had $550 and that you would know what he is talking about". POINTER advises to tell him that the $550 is to get what POINTER usually gets so that POOLE can make his bond. POOLE states that

"Jermaine Ollie Anderson" said that POINTER will know where he is and POINTER states he is at "Battery Heights" right by the office. Your affiant is familiar with Battery Heights being located at 3401 Campbell Street, Chattanooga, Tennessee. POINTER states that it's the second building from the left across from the office and it's the first door on the left downstairs. POINTER and POOLE continue to argue and talk about which building/apartment it is and POINTER states to call "Red" and he can explain which one it is. (Note: Your affiant is aware of the Facebook name "Jermaine Ollie Anderson" belonging to Michael JACKSON and is the account listed as "Target Account 2").

12. On January 19, 2021, your affiant listened to a recorded phone call between POINTER and POOLE that occurred on January 4th, 2021 that started at 5:30 PM. POINTER asks what POOLE is doing and POOLE states she just got to Battery Heights and that JACKSON was going to call in 30 minutes to get them. POOLE states she just got done talking to JACKSON and that he didn't know what POINTER was talking about. POINTER wants JACKSON to come out and talk to him on the phone. POOLE turns around and goes back to the apartment where JACKSON is so that POINTER and JACKSON can talk on the phone. JACKSON then gets on the phone and talks to POINTER so that JACKSON knows it's coming from him. POINTER states "Treat her like it's me bro I'm trying to get out" and JACKSON responds "Come on man, you know I'm going to do that bro, come on now". Due to previous conversations between POINTER and POOLE, your affiant believes POINTER is requesting JACKSON supply POOLE narcotics for him and JACKSON agrees.

13. On January 19, 2021, your affiant listened to a recorded phone call between POINTER and POOLE that occurred on January 4th, 2021 that started at 7:09 PM. POOLE advises that JACKSON aka "Mike Mike" is waiting for somebody to pull up

and that he was going to let POOLE know but he is taking a long amount of time but JACKSON said it would be a couple of more minutes. POINTER advises that if JACKSON does not come through to look up "Mike Fam" in his phone and call him or his name on Facebook is "Mike Wilson". POINTER then states to go to "Maro Meechie" on Facebook and to make sure to use POINTER's Facebook to message or call him. POOLE then calls "Maro Meechie" through Facebook and POINTER talks to him through speaker phone. POINTER advises that POOLE is doing it for him while he is incarcerated and that POOLE has the money but POINTER doesn't want to say amounts over the phone. "Maro Meechie" informs POINTER that he is waiting on someone right now as they speak. POINTER advises "Maro Meechie" to treat POOLE like him so that they can make POINTER's bond and they both agree and the Facebook call ends. POINTER then advises POOLE that whichever one calls her back first to get 100 from them. (Note: Your affiant was able to identify "Maro Meechie" Facebook account as belonging to Demetrius BYRD and further described as "Target Account 1")

14. On January 14, 2021, Chattanooga DEA members along with S/A Saint-Louis (ATF) conducted surveillance at 1664 Greendale Way Apt 236 at the residence of Jasmine POOLE. At 11:54 AM, your affiant observed a silver Hyundai with Georgia Tags of RHM0793 driven by Robert PAINTER pull into the parking complex. TFO Rodd Watters observed the Hyundai park directly next to Jasmine POOLE's vehicle and observed PAINTER sitting in his vehicle. At 11:58 AM, TFO Watters observed POOLE exiting the breezeway of the apartments and approaching the driver's side of the silver Hyundai. TFO Rodd observed POOLE at the driver's window of the silver Hyundai with PAINTER for a short amount of time and then walk away from the vehicle back into the apartments (TFO Note: TFO Watters was able to photograph the meeting and photographs attached). At 11:57 AM, TFO Watters observed the silver Hyundai

pulling out of the parking space and leaving the apartments. Your affiant then observed the silver Hyundai approach the traffic light at Greendale Way and Hixson Pike. Your affiant observed the Hyundai drive across Hixson Pike and immediately pull into the Circle K (4849 Hixson Pike) parking lot. Your affiant observed the unknown white male exit the vehicle and enter the Circle K store. A short time later, your affiant observed Robert PAINTER exit the Circle K store and enter back into the driver's seat of the silver Hyundai and sit in the vehicle for several minutes. At 12:07 PM, Your affiant observed the silver Hyundai pulling away from the Circle K parking lot and turn north onto Hixson Pike. The silver Hyundai then merged onto Highway 153 southbound when Officer Jeremiah Niver conducted a traffic stop on the vehicle for expired registration at Highway 153 and Hamill Road.

15.     During the traffic stop on Robert PAINTER, Officer Niver requested consent to search PAINTER's person and he consented to a search. Officer Niver located a cut straw with powdery residue inside PAINTER's jacket pocket. Officer Niver then read PAINTER his Miranda Rights and conducted a search of his vehicle. Inside the vehicle, Officer Niver located a small case with a syringe, spoon, and a string which are all common items associated with illegal narcotic use. PAINTER then admitted to Officer Niver that he uses "Oxycodone" and that he had just purchased 2 pills for $6 apiece and instantly took them. Officer Niver issued PAINTER a misdemeanor citation in lieu of arrest for Possession of drug paraphernalia and Expired Registration. The drug paraphernalia was booked into CPD Property Division by Officer Niver as evidence. Your affiant is familiar with the "Oxycodone" pills being small blue pills with the stamp of M/30 which are commonly counterfeit and contain Fentanyl.

16.     Based on your Affiant's training and experience, my knowledge of this investigation, I believe that in the majority of the above communications, POINTER and POOLE

was POINTER instructing POOLE on how to take over POINTER's drug trafficking organization while he was incarcerated. POINTER was instructing POOLE on how to obtain the counterfeit controlled substances believed to be Fentanyl from BYRD and JACKSON utilizing POINTER's Facebook account to Target Account 1 and Target Account 2. Your affiant reviewed toll records for both numbers utilized by POOLE, which include POINTER's phone number, and found that there were no outgoing calls from either phone number during the recorded conversation between POOLE and POINTER. Based upon that information, your affiant believes that the phone calls between POOLE to JACKSON and POOLE to BYRD were in fact made through Facebook.

17.     On March 31, 2021, at 1:31 PM, TFO Headden and TFO Watters met with TBI Special Agent Lauren Moon and a TBI confidential source "CS" at a predetermined location for the purpose of making a controlled purchase of counterfeit pills from 1806 S Highland Park Avenue. To ensure a proper and prosecutable case the following procedures were conducted prior to the controlled purchase. The CS and the CS vehicle were searched for any contraband and none was located. The CS was fitted with an electronic device capable of recording conversation during the controlled purchase. The CS was provided with $210.00 TBI confidential funds to utilize during the controlled purchase.

18.     The CS was followed directly from the predetermined meeting location to 1806 S Highland Park Avenue where TFO Watters observed the CS exit his/her vehicle and enter the residence. TFO Headden was monitoring the recording device and overhead the CS talking with BYRD inside the residence in reference to purchasing the counterfeit pills. BYRD advised the CS not to show up at the residence without calling the phone number 423-503-2400 again. BYRD further advised that his brother (Agents note: TFO Headden is familiar with BYRD calling Edward CHEEKS his brother) had the phone and could have coordinated with the CS to purchase the

pills. BYRD advised the CS that he only had the pills for $30 and that his brother had the $20 pills that the CS initially asked for. BYRD stated several times for the CS not to show up at the residence but rather call the 423-503-2400 phone number first.

19. The CS then purchased 6 counterfeit pills from BYRD for $210 and was observed exiting the residence at 1:45 PM. Upon completion of the transaction the CS was followed directly to the predetermined location within Chattanooga, TN. Upon meeting with the CS, TFO Headden retrieved 6 counterfeit pills that resemble Oxycodone M/30 and they were placed into a TBI evidence bag. The CS then turned over the electronic monitoring equipment that was utilized during the controlled purchase. The CS and CS vehicle were searched for any contraband and none was located.

20. During the post buy debriefing of the CS he/she confirmed that BYRD was the individual in the residence that sold the CS the 6 counterfeit pills.

21. Your Affiant has provided a preservation request to Facebook formally requesting preservation of all stored pages, communications, records, and other evidence contained within and related to the Target Account. Facebook indicated that it would preserve all such information until April 28, 2021.

## FACEBOOK, INC.

22. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

23. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

24. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

25. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook. Depending on the user's privacy settings, Facebook may also obtain and store the physical location of the user's device(s) as they interact with the Facebook service on those device(s).

26.      Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

27.      Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

28.      Facebook users can exchange private messages on Facebook with other users using Facebook Messenger. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

29.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

30.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

31.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

32.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

33.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

34.     Facebook users can exchange private messages on Facebook Messenger with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. There is also a separate application, Facebook Messenger, where users can send and receive private and group messages. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat

Case 1:21-mj-00059-CHS   Document 4   Filed 04/12/21   Page 13 of 28   PageID #: 18

communications are stored in the chat history for the account. Facebook also has a Video and Audio Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

35.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

36.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

37.     Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

38.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member,

including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

39.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

40.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

41.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

42.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the IP addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to

commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

43.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, other account information and prospective location information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

44.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B-1 and B-2. Upon receipt of the information described in Section I of Attachment B-1 and B-2, government-authorized persons will review that information to locate the items described in Section II of Attachment B1 and B-2.

## CONCLUSION

45.    Based on the foregoing, I request that the Court issue the proposed search warrant.

46.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

47.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

48.      I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed for a period of 180 days. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Justin Headden
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on _____ *April 12* _____, 2021

HON. CHRISTOPHER H. STEGER
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE INFORMATION ASSOCIATED WITH FACEBOOK USER ID: demetrius.byrd.92 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | Case No. 1:21-mj- 58 **Filed Under Seal** |

## ATTACHMENT A-1

### Property to Be Searched

This warrant applies to information associated with the following Facebook accounts

hosted by Facebook Inc., 1601 Willow Road, Menlo Park, California, USA.

- Believed User: Demetrius BYRD

- Username: Marco Meechie

- USER ID: http://facebook.com/demetrius.byrd.92

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE INFORMATION ASSOCIATED WITH FACEBOOK USER ID: macmike.getnmoney THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | Case No. 1:21-mj- 5 9<br><br>**Filed Under Seal** |

## ATTACHMENT A-2

### Property to Be Searched

This warrant applies to information associated with the following Facebook accounts

hosted by Facebook Inc., 1601 Willow Road, Menlo Park, California, USA.

- Believed User: Michael JACKSON

- Username: Jermaine Ollie Anderson

- USER ID: http://facebook.com/macmike.getnmoney

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE INFORMATION ASSOCIATED WITH FACEBOOK USER ID: demetrius.byrd.92 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | Case No. 1:21-mj- 5 8 <br><br> **Filed Under Seal** |

## ATTACHMENT B-1

### Particular Things to be Seized

I.  **Information to be disclosed by Facebook**

    To the extent that the information described in Attachment A-1 is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), for the period of January, 1, 2021 to Present, Facebook is required to disclose the following information to the government for each of the Facebook accounts described in Attachment B-1:

    (a)  All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

    (b)  All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

    (c)  All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

(d)     All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All other records of communications and messages made or received by the user, including all private messages, chat history, video and audio calling history, and pending "Friend" requests;

(f)     All "check ins," location history, and other location information;

(g)     All IP logs, including all records of the IP addresses that logged into the account;

(h)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)     All information about the Facebook pages that the account is or was a "fan" of;

(j)     All past and present lists of friends created by the account;

(k)     All records of Facebook searches performed by the account;

(l)     All information about the user's access and use of Facebook Marketplace;

(m)    The types of service utilized by the user, the length of service (including start date), the types of service utilized by the user, and the means and source of any payments associated with the service (including any credit card or bank account number);

(n)    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(o)    All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violation of Title 21, United States Code, Sections 841(a)(1), 846, and 843(b) have been committed, are being committed, and will be committed by Demetrius BYRD since January 1, 2021, including , for each user ID identified on Attachment A-1, information pertaining to the following matters:

(a) The distribution of controlled substances, and the disposition, concealment, and use of the proceeds thereof

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, Including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE INFORMATION ASSOCIATED WITH FACEBOOK USER ID: AND macmike.getnmoney THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | Case No. 1:21-mj-59 **Filed Under Seal** |

## ATTACHMENT B-2

### Particular Things to be Seized

**I. Information to be disclosed by Facebook**

To the extent that the information described in Attachment A-2 is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), for the period of January, 1, 2021 to Present, Facebook is required to disclose the following information to the government for each of the Facebook accounts described in Attachment A-2:

(a) All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c) All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

(d)     All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All other records of communications and messages made or received by the user, including all private messages, chat history, video and audio calling history, and pending "Friend" requests;

(f)     All "check ins," location history, and other location information;

(g)     All IP logs, including all records of the IP addresses that logged into the account;

(h)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)     All information about the Facebook pages that the account is or was a "fan" of;

(j)     All past and present lists of friends created by the account;

(k)     All records of Facebook searches performed by the account;

(l)     All information about the user's access and use of Facebook Marketplace;

(m)     The types of service utilized by the user, the length of service (including start date), the types of service utilized by the user, and the means and source of any payments associated with the service (including any credit card or bank account number);

(n) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(o) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violation of Title 21, United States Code, Sections 841(a)(1), 846, and 843(b) have been committed, are being committed, and will be committed by Michael JACKSON since January 1, 2021, including , for each user ID identified on Attachment A-2, information pertaining to the following matters:

(a) The distribution of controlled substances, and the disposition, concealment, and use of the proceeds thereof

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, Including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.